**Joseph B. KAUFMANN, Appellant,**

v.

**Daniel E. SHEEHAN, James R. Cain, and the Catholic Archbishop of Omaha, d/b/a Archdiocese of Omaha, Appellees.**

**No. 82–1810.**

United States Court of Appeals, Eighth Circuit.

Submitted May 18, 1983.

Decided May 26, 1983.

Rehearing and Rehearing En Banc Denied July 8, 1983.

Joseph B. Kaufmann, pro se.

Edward D. Hotz, and Jeanne A. Weaver of Hotz, Kluver, Kizer & Jahn, P.C., Omaha, Neb., for defendants-appellees.

Before BRIGHT, ROSS and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Joseph B. Kaufmann appeals from the district court's [1] order denying his motion to amend his complaint to add claims of deprivation of due process by officials of the Roman Catholic Archdiocese of Omaha, and granting summary judgment in favor of defendants on his allegations of defamation and conspiracy to commit defamation. Because his due process arguments deal solely

1. The Honorable Richard E. Robinson, Senior United States District Judge for the District of Nebraska.

with procedures established by church authority, we believe that we here deal with questions of ecclesiastical due process and that such questions must be left to church authorities. Accordingly, we affirm.

The Archdiocese of Omaha employed Kaufmann as a parish priest. In the spring of 1975, Kaufmann expressed dissatisfaction with his current assignment to Archbishop Daniel E. Sheehan and requested a leave of absence. Before entertaining Kaufmann's request, the Archbishop required that he consult a psychiatrist. Kaufmann complied and saw Omaha psychiatrist Dr. John Blodig twice during the fall of 1975. In October 1975, Kaufmann voluntarily resigned his position and moved to San Francisco, California, to seek employment as a priest with the Archdiocese of San Francisco.

San Francisco church officials requested information about Kaufmann from the Archdiocese of Omaha. Father James R. Cain answered the inquiry in a letter dated December 3, 1975. The letter stated that although there was no objection to Kaufmann's working in San Francisco, he was in need of psychiatric care. The day Father Cain's letter was written church officials in San Francisco denied Kaufmann's request for employment and recommended that he return to Omaha.

At this point, Kaufmann authorized Dr. Blodig to release his evaluation to the Archdiocese of Omaha. Dr. Blodig complied and sent his report to Archbishop Sheehan on March 22, 1976. The Archbishop then wrote to the Archdiocese of San Francisco on March 29, 1976, setting forth most of Dr. Blodig's report in his letter. This letter is the origin of most of the controversy presented in this case. In substance, it expressed concern about Kaufmann's need for further psychiatric treatment as suggested by Dr. Blodig's report. Sometime thereafter, Kaufmann wrote to the Vatican's Apostolic Delegate in Washington, D.C., and the Sacred Congregation for the Doctrine of the Faith in Rome seeking to be released from his vows of priesthood. In two letters dated August 30, 1976, and De-cember 27, 1977, Archbishop Sheehan wrote to these church officials in response to their queries about Kaufmann's request to leave the priesthood and forwarded copies of Dr. Blodig's report to them. Kaufmann alleged that the publication of Dr. Blodig's report constituted defamation and was part of a continuing civil conspiracy among Omaha archdiocesan officials to prevent him from obtaining a position with the Archdiocese of San Francisco.

In the spring of 1976, Kaufmann attempted to resolve his differences with Archbishop Sheehan by submitting his claims for conciliation and arbitration through an archdiocesan grievance procedure. Although the record is unclear, Kaufmann apparently abandoned this process at an early stage. (The grievance procedure called for informal conciliation, then arbitration, and finally trial before the Archdiocesan Administrative Tribunal, which would follow canon law in resolving disputes. Kaufmann never progressed beyond the initial informal conciliation stage). Kaufmann claimed that he was denied due process because church officials did not comply with the grievance procedure. He then commenced this action.

The district court dismissed Kaufmann's conspiracy and defamation claims as time-barred under Neb.Rev.Stat. § 25-208 (Reissue 1979) (action for libel must be brought within one year from the date of the publication of the defamatory matter upon which the action is based). This complaint was filed September 18, 1979, twenty-one months after Archbishop Sheehan's most recent publication of Dr. Blodig's allegedly defamatory report on December 27, 1977. The district court stated:

> While Nebraska recognizes a cause of action for civil conspiracy, the courts have emphasized that the gravamen of the action is not the conspiracy itself but the underlying tort [citing *Dixon v. Reconciliation, Inc.,* 206 Neb. 45, 291 N.W.2d 230, 232 (1980)] . . . .
>
> In this case the underlying tort is defamation . . . . Accordingly, the applicable statute of limitations is the one set out in

the Nebraska statutes for the tort of defamation.

Slip op. at 4. The court reasoned that merely alleging a conspiracy to commit a tort should not change the statute of limitations governing the underlying tort.

> To permit the plaintiff to circumvent the applicable statute of limitations for defamation by the simple procedure of alleging a conspiracy to defame would defeat the purpose of the statute of limitations imposed by the legislature. There appears to be no logical distinction between the alleged conspiracy to defame and the alleged defamation itself. Both causes of action injure or damage the reputation of the plaintiff.

*Id.* at 5 (quoting *Auld v. Mobay Chemical Co.,* 300 F.Supp. 138, 141 (W.D.Pa.1969)).

Kaufmann argues primarily in this appeal that he was deprived of his due process rights promised by the church, but because of the less than clear nature of his argument, we have reviewed the statute of limitations question. We conclude that the district court properly dismissed Kaufmann's claims for defamation and conspiracy to commit defamation as untimely under the applicable Nebraska statute of limitations.

Kaufmann acting pro se moved for leave to amend his first amended complaint. Kaufmann sought to add two new claims to his complaint by alleging that church officials violated canon law by depriving him of a due process hearing before a church tribunal.[2] The district court determined that the addition of these claims "would not advance [appellant's] cause and would be prejudicial and costly to the [appellees]. See *Foman v. Davis,* 371 U.S. 178, 182 [83 S.Ct. 227, 230, 9 L.Ed.2d 222] (1962) [court may deny motion to amend based on futility of amendment]." *Id.* at 6. In the court's view, these additional claims, which it characterized as alleging a "violation of ecclesiastical due process," patently failed to state a claim against appellees. The court remarked that "[i]f there is an earthly forum for the adjudication of such allegations, it is not a federal court." *Id.* at 6–7. Accordingly, the court denied the motion to amend.

Kaufmann argues that the good which the due process procedure of the Archbishop promised him in writing is a secular good, and that the charges published about him were secular accusations. He does not attempt to make serious argument to support these accusations. We think it clear that the proposed amendments to the complaint cannot be so construed.

■ Fed.R.Civ.P. 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires," but the granting of such a motion is left to the discretion of the district court. *Russ v. Ratliff,* 578 F.2d 221, 224 (8th Cir.1958). We conclude that the court did not abuse its discretion in denying the motion to amend.

---

2. These claims stated:

#### XIV

That in furtherance of said preconceived combination, contract, conspiracy and concerted course of conduct to prevent plaintiff from obtaining employment in his chosen profession, and by way of maintaining secrecy of defendants' actions to plaintiff's injury, defendants did willfully deprive plaintiff his requested right, so guaranteed by written promise, to due process, which Due Process Procedure was promulgated and announced by Defendant Daniel E. Sheehan on May 21, 1971 in defendants' official organ of communication *The True Voice* and which reads in pertinent part as follows:

> Covered are conflicts any person may have with the archbishop, an appointee of the archbishop, a priest of the archdiocese, a Catholic institution or organization of the archdiocese or "any other person, group or institution exercising administrative authority in the archdiocese."

#### XV

That to continue negating plaintiff's due process protections from the court of first instance in Omaha (Paragraph XIV), defendants did also contravene plaintiff's clergy appeals to church officials in Washington, D.C. and in Rome, Italy with letters containing the so-called Blodig report on August 30, 1976 and December 27, 1977, respectively, and thereby violated plaintiff's rights as guaranteed in provisions of church law (*Codex Iuris Canonici,* Liber Quarto "De Processibus"), among which Canon 1726 specifically regarding the need of the parties to know issues before a court and which reads:

> Obiectum seu materia iudicii constitituitur ipsa litis contestatione seu formali conventi contradictione petitioni actoris facta animo litigandi coram iudice.

██ Because appellant drafted his proposed amendment pro se, the district court was required to liberally construe it. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1974). The claims set forth in his proposed amendment were clearly based upon acts allegedly intended to prevent him from obtaining employment in his chosen profession—the priesthood. Kaufmann maintained that church officials had deprived him of rights guaranteed by an archdiocesan due process procedure, contravened his "clergy appeals to church officials in Washington, D.C., and in Rome, Italy" and violated certain other of his canon law rights. The only possible construction of these claims was that they dealt squarely and exclusively with the laws and regulations for internal discipline adopted by the Roman Catholic Church or the Archdiocese of Omaha.

The most recent decision of the United States Supreme Court on the role of the courts in church-related controversies is *Serbian Eastern Orthodox Diocese v. Milivojevich et al.,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). *Milivojevich* involved the review of a decision by the Illinois Supreme Court reversing a determination by the governing body of the Serbian Orthodox Church as "arbitrary" under the "fraud, collusion, or arbitrariness" exception announced in *Gonzalez v. Archbishop,* 280 U.S. 1, 16, 50 S.Ct. 5, 7 (1929).[3] The Supreme Court rejected the Illinois court's application of the exception, holding

> [W]hether or not there is room for "marginal civil court review" under the narrow rubrics of "fraud" or "collusion" when church tribunals act in bad faith for secular purposes, no "arbitrariness" exception—in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations—is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law. For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church adjudicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them.

426 U.S. at 713, 96 S.Ct. at 2382 (footnote omitted).

██ The allegations of combination, conspiracy, and concerted course of action contained in the proposed amended complaint might arguably state a claim for fraud or collusion, particularly when viewed under the *Haines v. Kerner* standard of liberal construction for pro se pleadings. Significantly, *Milivojevich* did not foreclose " 'marginal civil court review' under the narrow rubrics of 'fraud' or 'collusion' when church tribunals act in bad faith for secular purposes." *Id.* In the instant case, however, Kaufmann's claims relate to his status and employment as a priest, and possibly to other matters of concern with the church and its hierarchy, and go to the heart of internal church discipline, faith, and church organization, all involved with ecclesiastical rule, custom and law. While there may be

---

**3.** The Supreme Court had established in *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 727, 20 L.Ed. 666 (1872), that decisions of the proper church tribunals on ecclesiastical matters, although affecting civil rights, were final and binding on civil courts. Subsequently, dictum in *Gonzalez v. Archbishop,* 280 U.S. at 16, 50 S.Ct. at 7, suggested a possible exception to the *Watson* rule: the decisions of ecclesiastical tribunals might be subject to civil court review as the products of "fraud, collusion, or arbitrariness." *See Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. at 711–12, 96 S.Ct. at 2381.

some secular aspects to employment and conceivably even to the priesthood or clergy, it is apparent that the priest or other member of the clergy occupies a particularly sensitive role in any church organization. Significant responsibility in matters of the faith and direct contact with members of the church body with respect to matters of the faith and exercise of religion characterize such positions. In spite of Kaufmann's argument, the proposed amendments to the complaint deal only with matters of religion and there is no allegation that we can construe in any other light. Accordingly, we do not here deal with secular purposes and the "fraud" or "collusion" exceptions are unavailable. *Milivojevich* and its underlying rationale prevent this court from deciding what are inherently religious issues. These issues should be left to church authorities for final determination.

The judgment is affirmed.