1999 SD 62

Mike DECKER, Anna Decker, Amos Decker, John Hofer, Lydia Hofer, Lydia Hofer, Ronald Hofer, Reinhart Hofer, Samuel Hofer, David Decker, Dorothy Decker; and Susanne Decker, David Decker, Jr., Daniel Decker, Elisabeth Decker, and Milinda Decker, minor children, By and Through their Guardian Ad Litem David DECKER; Jerry Decker, Betty Decker; and Julia Decker, a minor child, by and through her Guardian Ad Litem, Jerry Decker, Plaintiffs and Appellants,

v.

TSCHETTER HUTTERIAN BRETHREN, INC., and all Directors, Officers, Shareholders thereof who are not plaintiffs, Bur Oaks Hutterian Brethren, Inc., and all Directors, Officers, and Shareholders thereof who are not plaintiffs, Samuel Hofer, Aaron Hofer, Herman Decker, Jacob Hofer, George Hofer, Andrew Hofer, Jacob Jr. Hofer, Andy Hofer, Paul Hofer, David Hofer, Larry Decker, Richard Hofer, Jonathan Hofer, Sam Hofer, Jr., John Hofer, Jr., all in their individual capacity and in their capacity as Directors, Officers, and/or Shareholders of the above named corporations, together with all Jane Does who are married to the above named male defendants and who are residents of the colonies referenced above, together with all John Does and Jane Does who are children of the above named male defendants and who are residents of the colonies referenced above, Defendants and Appellees.

No. 20612.

Supreme Court of South Dakota.

Argued Jan. 12, 1999.

Reassigned March 31, 1999.

Decided May 26, 1999.

Steven G. Haugaard and Wade D. Druin, Sioux Falls, for plaintiffs and appellants.

Jeffrey Sveen and Gregg Magera of Siegel, Barnett and Schutz, LLP, Aberdeen, for defendants and appellees.

GILBERTSON, Justice (on reassignment).

## INTRODUCTION

[¶ 1.] This case calls for a determination by this Court as to whether the underlying dispute between the parties is secular, and

thus appropriate for us to adjudicate, or whether it is religious and thus beyond the jurisdiction of the courts of the State of South Dakota.

## FACTS

[¶ 2.] Here, as in *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 699, 96 S.Ct. 2372, 2376, 49 L.Ed.2d 151, 157 (1976) a case involving disputes of a religious nature, "[a] proper perspective on the relationship of these parties and the nature of this dispute requires some background discussion."

[¶ 3.] The Hutterite Religion traces its roots back to the time of the Reformation in Germany in the 1500's. It was founded by Jacob Hutter, its martyr, who is the source of the religion's name. Like others who have championed new religious ideas, Hutter ran afoul with the powers-at-be of his day and as a result he was burned at the stake in 1536. However, his beliefs survived him in the form of the Hutterite Church.

[¶ 4.] The Hutterite Church is a communal way of life and is based on the Book of *Acts* Chapter 2[1] and Chapter 4.[2] For several centuries the Hutterites lived a communal agrarian lifestyle in several European countries. In the 1870's, religious persecution forced their relocation to the Midwestern United States and Canada. As a colony grew to approximately 100 to 150 members, rather than increase further, a spin-off colony would be created. Currently there are 63 colonies in North Dakota, South Dakota and Minnesota.

[¶ 5.] A colony is completely communal. The dining hall, church and school are communal. Members dress in similar clothing. The operation of the farming enterprises is also communal with the colony holding title to all real and personal property in the colony. Membership is voluntary but members are not permitted to own their own personal property. All individual labor and services are for the sole benefit of the colony and its church. To maintain this communal religious lifestyle, contact with the world outside the colony is limited only to what is regarded by colony leadership as necessary.[3] In return colony members are provided by the colony with all the necessities of life, including food, clothing, shelter and medical care from the cradle to the grave.

[¶ 6.] This litigation involves the Tschetter Hutterian Brethren Inc., and Bur Oaks Hutterian Brethren Inc., (hereinafter "the colony") which are nonprofit corporations organized under the laws of the State of South Dakota. An inspection of the Articles of Incorporation shows the operation of the economic enterprises of the colony is inseparable from its religious principles.[4] Membership in the colony is under the

---

1. "And all who believed were together and had all things in common; and they sold their possessions and goods and distributed them to all, as any had need." *Acts* 2:44–45 (Revised Standard Version, 1952 Ed.).

2. "Now the company of those who believed were of one heart and soul, and no one said that any of the things which he possessed was his own, but they had everything in common. And with great power the apostles gave their testimony to the resurrection of the Lord Jesus, and great grace was upon them all. There was not a needy person among them, for as many as were possessors of lands or houses sold them, and brought the proceeds of what was sold and laid it at the apostles' feet; and distribution was made to each as any had need." *Acts* 4:32–35 (Revised Standard Version, 1952 Ed.).

3. The colonies do not allow television, radio or outside media as they believe it contains corrupting worldly influences. Exceptions are materials to educate them to be more productive farmers and approved religious materials.

4. The Articles of Incorporation state in part:

    IV–CORPORATE PURPOSE:

    The purpose of the Corporation is to promote the Hutterian religious faith and church. It is a central part of the beliefs of the Hutterian Church that members should live together in a farming community, without individual ownership of personal or real property, and that they should devote their labors in harmony with the dictates of God's teachings; and further, that this corporation shall provide the facilities and means to the members of said Hutterian

direction of the Board of Directors elected by a majority of voting members.[5] The By–Laws indicate the Board of Directors is guided by its religious faith and failure to follow the rules of the religion and colony can lead to expulsion from the colony and its church.[6]

[¶ 7.] These colonies belong to the Schmiedleut Conference of the Church. Rev. Jacob Kleinsasser was Senior Elder or President of the Conference, which ordinarily is a lifetime appointment. This is a powerful position as the Senior Elder acts as the final arbiter or decision-maker regarding issues affecting the members of the Church and the colonies. In 1992 a book was published accusing Rev. Kleinsasser of improper financial dealings in regards to the Church and colonies. Based on these accusations a Conference meeting was held in December of 1992 which was attended by 173 ministers of the Hutterian Church. Ninety-five repudiated Rev. Kleinsasser's leadership as Senior Elder and opted to follow the leadership of Rev. Joseph Wipf. The remaining 78 ministers remained loyal to the leadership of Rev. Kleinsasser. Of the 63 colonies in the Dakotas and Minnesota, all but five repudiated the leadership of Rev. Kleinsasser.

Church to practice and observe their faith. To effectuate that purpose, the Corporation shall maintain living quarters and engage in farming and agricultural operation.... Notwithstanding any other provision or these Articles of Incorporation, this Corporation is intended to be and shall be a religious or apostolic corporation, pursuant to Section 501(d) of the Internal Revenue code of 1954 and acts amendatory thereto and shall have a common treasury or community treasury; and the business which the Corporation shall engage in shall be for the common benefit of the members of the Corporation in carrying out and effectuating their Hutterian religious faith....

VII–LIMITATIONS
This Corporation shall never be operated for the primary purpose of carrying on a trade for profit, but shall be operated to provide facilities to effectuate the tenets of the Hutterian Church.

IX–CHURCH
This Corporation is a church and a religious corporation and its members shall be associated with the Hutterian Church and Brotherhood, and all of its members shall live a communal life. No member of the corporation shall live outside the colony nor hold any real or personal property rights individually, nor hold any property rights in the corporation's property. Membership is voluntary. All rights of membership, grounds for their expulsion, and managerial rules over the members of the corporation and over the property of the corporation shall be prescribed by the By–Laws, none of which shall be contrary to the tenets, rules or faith of the Hutterian Church.

5.  Based on religious principles, membership is divided into two categories, voting and non-voting. Only adult males who are members of the church in good standing and married are eligible to be voting members. All other colony members are nonvoting members.

6.  The By–Laws state in part:

Article IX. Membership and property rights.
Sec. 1. Property Rights. All [members] of this Corporation shall live a communal life and following the teachings and tenets of the Hutterian Church; and they shall join, without pay, wages or salary, in the conduct of the business of this Corporation for the support of the Hutterian Church....
Sec. 3. Rules. All members of this Corporation shall recognize and abide by the rules of the Hutterian Church, and each of them, and all of them do renounce the right to hold private property; and each and all of the members agree to abide by the rules, regulations, directives, and authority of the presiding bishop or bishops of the Hutterian Church to which all members of this corporation, through its local church, belong.
Sec. 4. Adoption of Rules. The Board of Directors of this Corporation may lay out and define, by resolution or otherwise, rules and regulations for the practice of a communal form of living by the Corporation and their dependent families, which rules and regulations shall not be inconsistent with the Articles of Incorporation and these By–Laws, and shall be in conformity with the rules and regulations of the Hutterian Church.
Sec. 5. Expelling a Member. Any member of this Corporation and Church may be expelled ... by refusing to obey the rules and regulations announced by the Board of Directors for the living and practicing of

[¶ 8.] The effect of this religious schism was felt throughout the colonies. Numerous colonies split into pro and anti Kleinsasser factions. This split occurred in the colonies involved in this litigation. Plaintiffs continue to follow Rev. Kleinsasser while the Defendants repudiated him and followed Rev. Wipf.

[¶ 9.] At the time of this schism the Tschetter Colony was under the religious leadership of Rev. Tom Decker. He remained loyal to Rev. Kleinsasser. The Plaintiffs in this action supported Rev. Decker and Rev. Kleinsasser. Rev. Decker refused to give Holy Communion, baptize or marry members of the colony who had repudiated Rev. Kleinsasser. Attempts at reconciliation between Rev. Decker and the majority of the colony were unsuccessful. In May of 1995, Rev. Decker resigned.

[¶ 10.] The majority of the colony who followed Rev. Wipf attempted to reconcile with the Plaintiffs. This proved unsuccessful. With tensions growing in the colony, Plaintiffs were given notice of a meeting to be held on March 27, 1995. The purpose of the meeting was to consider Plaintiffs' refusal to comply with the will of the majority of the colony residents concerning religious and colony matters. At that meeting the Plaintiffs were expelled by the majority from the colony and its church.

[¶ 11.] The Plaintiffs refused to recognize their expulsion by the majority. Rather than leaving the colony, most of the now excommunicated Plaintiffs chose to remain although refusing to participate

in colony work and worship. Further attempts at reconciliation by the Defendants were unsuccessful.[7] The dispute festered and became further aggravated as time went on as the Hutterite religion does not recognize the use of secular courts to vindicate rights or eject non-members. Therefore, the majority Defendants were unable to convince and unwilling to force [8] these Plaintiffs to leave the colony. A review of affidavits from both sides to this litigation indicates the allegations in the complaint stem from the fact both factions still remain at the colony and dislike intensely the others' on-going presence. To encourage the Plaintiffs to vacate, the Defendants began shutting off utilities to the Plaintiffs' residences although only with advance notice. Plaintiff Mike Decker in his affidavit declared, "the Plaintiffs' family members have no desire to separate from the colony and have not separated from the Hutterite Church and its faith."

[¶ 12.] This litigation followed with the filing of the complaint by the Plaintiffs. It was one of a flurry of lawsuits instituted by Rev. Kleinsasser's followers in an attempt to retain control of the colonies split by the religious dispute. Although hardly a model of clarity, the lengthy complaint appears to allege tortious interference with a possessory interest and/or trespass to chattels, trespass, intentional infliction of emotional distress, negligent infliction of emotional distress, joint venture, oppression of corporate minority members, breach of fiduciary duty, implied trust and unjust enrichment.[9] All causes of action alleged by the Plaintiffs appear to have

the communal form [of] living required by these By–Laws....

7. Based on biblical principles, reconciliation is apparently to be without punishment of the Plaintiffs or retaliation by the Defendants. All the excommunicated Plaintiffs had to do to reconcile was acknowledge the religious authority of the majority and rejoin the communal lifestyle. One excommunicated family did reconcile and rejoin the colony.

8. Based on religious beliefs, Hutterites are pacifists.

9. Although the dissent goes on at great lengths to focus on tortious conduct it labels as assault and battery, those causes of action were not pled in the complaint. We are well aware of the liberal policy applicable to notice pleading under our modern rules of civil procedure, but when a party takes pains to explicitly recite each cause of action, then it becomes an usurpation of judicial power to read into that party's pleadings causes of action not asserted. Indeed, it is neither our duty nor our right to redraft a pleading to assist any litigant.

occurred in the colony or concern its control and the contents of its membership.

[¶ 13.] Plaintiffs apparently consist of every man, woman, child and baby in the Rev. Kleinsasser faction of the colony church. These Plaintiffs in their complaint sue every man, woman, child and baby who remain in the colony and its church who are also not members of the Plaintiffs' religious faction and thus are members of the Rev. Wipf faction. The only way for a church member to avoid being sued as a Defendant is to become a Plaintiff.

## PROCEDURE

[¶ 14.] After both sides had filed pleadings, affidavits and documents, the trial court conducted a telephonic hearing on various matters. Although a more extensive hearing would have been preferable, the question is whether the trial court erred by determining this was in essence a religious dispute and was therefore justified in dismissing the lawsuit.

> It is the rule in this state that jurisdiction must affirmatively appear from the record and this court is required *sua sponte* to take note of jurisdictional deficiencies, whether presented by the parties or not.... The test for determining jurisdiction is ordinarily the nature of the case, as made by the complaint, and the relief sought.

*State v. Phipps*, 406 N.W.2d 146, 148 (S.D. 1987) (citations omitted). The question of jurisdiction can be raised at anytime and by this Court upon its own motion. *Deno v. Oveson*, 307 N.W.2d 862, 863 (S.D.1981). A motion to dismiss for lack of subject matter jurisdiction pursuant to SDCL 15–6–12(b)(1) based on the First Amendment to the United States Constitution is a recognized legal procedure. *Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468, 470 (8thCir.1993); *O'Connor v. Diocese of Honolulu*, 77 Hawai'i 383, 885 P.2d 361 (1994). In so doing the court has the authority to consider material in the court file in addition to the pleadings. *Drevlow,*

991 F.2d at 470. *See also Osborn v. United States*, 918 F.2d 724 (8th Cir.1990).

## ISSUE PRESENTED

Was the trial court correct in dismissing this action for lack of subject matter jurisdiction on the grounds it was a religious dispute rather than a secular dispute.

[¶ 15.] We determine that the trial court was correct.

## LEGAL ANALYSIS

[¶ 16.] The First Amendment to the United States Constitution and art. VI, § 3 of the South Dakota Constitution preclude civil courts from entertaining religious disputes over doctrine, leaving adjudication of those issues to ecclesiastical tribunals of the appropriate church. The fact that a portion of the dispute involves property claims does not preclude this constitutional application and protection. Even when possession or ownership of church property is disputed in a civil court, "there is substantial danger that the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs." *Milivojevich*, 426 U.S. at 709, 96 S.Ct. at 2380, 49 L.Ed.2d at 162.

> [T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern.... The First Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.

*Id.* at 709–10, 96 S.Ct. at 2380–1, 49 L.Ed.2d at 163. (Citations omitted). *Milivojevich* is factually applicable as it involves a dispute between two Bishops regarding who had the authority to control the church body, property and assets. An attempt by a secular court to adjudicate such disputes "frequently necessitates the interpretation of ambiguous religious law and usage." *Id.* at 708, 96 S.Ct. at 2380, 49 L.Ed.2d at 162. It is improper for a secular court to evaluate conflicting testimony concerning internal church procedures. *Id.* at 717–18, 96 S.Ct. at 2384–5, 49 L.Ed.2d at 167–68. The reason for this ecclesiastical abstention doctrine rests squarely with the non-secular nature of the subject matter of the dispute:

> The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of the contravened questions of faith within the association, and for the ecclesiastical government of the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organization itself provides for.

*Id.* at 710–11, 96 S.Ct. at 2381, 49 L.Ed.2d at 163–4 (citing *Watson v. Jones,* 13 Wall. 679, 728–29, 20 L.Ed. 666 (1872)).

[¶ 17.] In *Drevlow* a minister sued the Missouri Synod Lutheran Church for the torts of libel, negligence and intentional interference with his legitimate expectancy of employment. 991 F.2d at 469. He claimed the church improperly put derogatory information about him and his wife in his personnel file. Under church rules, this information precluded him from receiving a pastorate at a Synod congregation. When considering the ecclesiastical decisions of the Synod, the Eighth Circuit noted it did not have subject matter jurisdiction over employment decisions where religious beliefs, procedures or law were implicated. *Id.* at 471. *See also Scharon v. St. Luke's Episcopal Presbyterian Hosp.,* 929 F.2d 360 (8th Cir.1991) (claims of chaplain against Episcopal hospital for employment discrimination dismissed as involving religious questions); *Kaufmann v. Sheehan,* 707 F.2d 355 (8th Cir.1983) (claims of priest against Roman Catholic Church for defamation and conspiracy dismissed as involving religious questions); *Belin v. West,* 315 Ark. 61, 864 S.W.2d 838 (1993) (claims of intentional infliction of emotional distress, defamation and tortious interference with business expectation dismissed as Bishop's authority over employment of minister by congregation rested on religious doctrine); *O'Connor,* 885 P.2d 361; *Pierce v. Iowa–Missouri Conference of Seventh–Day Adventists,* 534 N.W.2d 425 (Iowa 1995); *Parish of the Advent v. Protestant Episcopal Diocese of Massachusetts,* 426 Mass. 268, 688 N.E.2d 923 (1997); *Basich v. Board of Pensions, Evangelical Lutheran Church in America,* 540 N.W.2d 82 (Minn.App.1995) *cert. denied,* 519 U.S. 810, 117 S.Ct. 55, 136 L.Ed.2d 18 (1996) (dispute over church investment of pension funds involved ecclesiastical issues of church policy).[10]

10. Instructive is the case of *Paul v. Watchtower Bible and Tract Soc. of New York, Inc.,* 819 F.2d 875 (9th Cir.1987). There Paul, a former Jehovah's Witness, sued the Church for defamation, invasion of privacy, fraud and outrageous conduct as the Church re-

[¶ 18.] Secular courts will adjudicate disputes under the "neutral principles of law" doctrine. *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). We discussed this doctrine in *Foss v. Dykstra:*

> The neutral-principles approach calls for a completely secular examination by civil courts into church documents, deeds to the property in question, state statutes and other relevant evidence to determine ownership. The key to the neutral-principles approach is that such determination is to be made "exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges."

342 N.W.2d 220, 222 (S.D.1983) (citing *Foss v. Dykstra,* 319 N.W.2d 499, 500 (S.D. 1982) (quoting *Jones,* 443 U.S. at 603, 99 S.Ct. at 3025, 61 L.Ed.2d at 785)). However, as determined in *Jones,* the neutral-principles of law rationale runs afoul of the First Amendment and likewise art VI, § 3 of the South Dakota Constitution when church doctrine and policy "pervade" the documents governing the church, which in the case before us are the colony's Articles of Incorporation and By–Laws. Plaintiffs counter that "[s]imply put the Corporation, Colony, and Church have turned their back on the Plaintiffs."

[¶ 19.] Because the secular law knows no heresy, is committed to the support of no religious dogma and the establishment of no sect, how are we to adjudicate this dispute "to effectuate the tenets of the Hutterian Church," . . . and decide whether the Defendants are allowing the Plaintiffs to "live together in a farming community, without individual ownership of personal or real property and that they should devote their labors in harmony with the dictates of God's teachings[?]" Are the property claims to be adjudicated by the courts of this State based upon "[a]ll rights of membership, grounds for their expulsion and managerial rules over the members of the corporation and over the property of the corporation [as] prescribed by the By–Laws none of which shall be contrary to the tenets, rules or faith of the Hutterian Church[?]" With respect to the operation of the colony how do we apply the following By–Law?

> All members of this Corporation shall recognize and abide by the rules of the Hutterian church, and each of them and all of them do renounce the right to hold private property; and each and all of the members agree to abide by the rules, regulations, directives, and authority of the presiding bishop or bishops of the Hutterian Church to which all members of this corporation, through its local church, belong.

[¶ 20.] All acts complained of by the Plaintiffs arose from their excommunication from the church and attempted expulsion from the colony. It is suggested that we conduct an examination to determine whether these acts were done with malice thus purporting to negate any claim of religious privilege. Given the neutral principals of law limitation, how do we determine whether malice exists by the Defen-

---

quired its members to "shun" former members like Paul. Although not decided under the ecclesiastical abstention doctrine of *Milivojevich* because there was no dispute over interpretation of Church doctrine, the court nevertheless affirmed summary judgment for the Church. It did so because the court found that imposition of tort damages on the Jehovah's Witnesses for engaging in the religious practice of shunning would constitute a direct burden on their religion. It concluded:

> Providing the Church with a defense to tort is particularly appropriate here because Paul is a former Church member. Courts generally do not scrutinize closely the relationship among members (or former members) of a church. Churches are afforded great latitude when they impose discipline on members or former members. We agree with Justice Jackson's view that "[r]eligious activities which concern only members of the faith are and ought to be free— as nearly absolutely free as anything can be." *Prince v. Massachusetts,* 321 U.S. 158, 177, 64 S.Ct. 438, 445, 88 L.Ed. 645 (1944) (concurring).

819 F.2d at 883.

dants under the following "tenets, rules or faith of the Hutterian church" which was the basis for the plaintiffs' excommunication and attempted expulsion?

> If your brother sins against you, go and tell him his fault, between you and him alone. If he listens to you, you have gained your brother. But if he does not listen, take one or two others along with you, that every word may be confirmed by the evidence of two or three witnesses. If he refuses to listen to them, tell it to the church; and if he refuses to listen even to the church, let him be to you as a Gentile and a tax collector.

*Matthew,* 18:15–18 (Revised Standard Version, 1952 Ed.). As in *Jones,* issues of church doctrine and policy are pervasive. 443 U.S. at 609, n. 7, 99 S.Ct. at 3028, n. 7, 61 L.Ed.2d at 788, n. 7. "It is axiomatic that the guidance of the state cannot substitute for that of the Holy Spirit and that a courtroom is not the place to review a church's determination of 'God's appointed.'" *Rayburn v. Gen. Conf. of Seventh–Day Adventists,* 772 F.2d 1164, 1170 (4th Cir.1985).

[¶ 21.] Plaintiffs in their brief concede all actions they complain of either occurred at the colony or involve its Articles of Incorporation and By–Laws. This colony was founded in 1941. The record is void of any discord among the colony members prior to the current religious schism.

[¶ 22.] Another Hutterite Colony schism occurred in *Wollman v. Poinsett Hutterian Brethren, Inc.,* 844 F.Supp. 539 (D.S.D. 1994). After analyzing the dispute provoked by the Rev. Kleinsasser–Rev. Wipf controversy, the court concluded:

> The Court is unable to envision any set of facts which would more entangle the Court in matters of religious doctrine and practice. The religious communal system presented in this case involves more than matters of religious faith, it involves a religious lifestyle. Any individual Hutterian colony member's entire life – essentially from cradle to grave – is governed by the church. Any resolu-

tion of a property dispute between a colony and its members would require extensive inquiry into religious doctrine and beliefs. It would be a *gross violation* of the First Amendment and Supreme Court mandates for this Court to become involved in this dispute.

*Id.* at 543. (Emphasis added).

[¶ 23.] We agree with this analysis. The record indicates there is no separation of religious life from a secular life in a Hutterite colony because there is no separate secular life. The colony is run and its members, whether the followers of Rev. Kleinsasser or Rev. Wipf, all conduct their lives on religious absolutes based on the Bible and the Ten Commandments, "Thou shalt ... and Thou shalt not." There are no separate secular shades of gray. Likewise, suing every man, woman, child and baby in their individual capacity who remain in the congregation is simply the same as suing the colony church congregation as the individual members renounce all rights to private ownership of property as a requirement for continued membership in the colony and its church. Plaintiffs in their complaint concede the core of the dispute when they declare both the Plaintiffs and Defendants are "members of the Hutterian church located at the Bur Oaks Hutterian Brethren ... and Tschetter Colony...."

[¶ 24.] We are not ecclesiastical jurists of the Hutterite faith and have no constitutional basis to interfere with this religious dispute. If there is an earthly forum for adjudication of Plaintiffs' allegations, it is not the secular courts of this State. *Kaufmann,* 707 F.2d at 359. For the above reasons we hold adjudication of Plaintiffs' claims by the courts of this state is precluded by the First Amendment to the United States Constitution and art. VI, § 3 of the South Dakota Constitution. As such, we affirm the circuit court.

[¶ 25.] MILLER, Chief Justice and KONENKAMP, Justice, concur.

[¶ 26.] SABERS and AMUNDSON, Justices, dissent.

SABERS, Justice (dissenting).

[¶ 27.] I dissent from Justice Gilbertson's writing. I submit the Constitution protects and guarantees life, liberty, and the pursuit of happiness. These rights and freedoms are not discarded because someone is voted in or out of the Hutterian colony.

[¶ 28.] The religious *beliefs* of the Colony members are also protected by the Constitution, but the *actions* of its members are only qualifiedly privileged.

[¶ 29.] Shunning is obviously protected. However, affirmative actions resulting in assaults and other torts under the laws of South Dakota are not protected. This is so even if accomplished under the guise of "religious beliefs."

[¶ 30.] The Articles of Incorporation of the Colony, no matter how well intended, *do not trump* the Constitution of the State of South Dakota and the United States.

[¶ 31.] Additionally, Justice Gilbertson's writing would put this court's blessing on the totally improper procedural shortcuts [11] taken by the trial court in this case.

[¶ 32.] Even if the writing were correct in protecting the Colony and the Defendants in their official capacities from suit, it is wholly improper to extend that protection to the Defendants in their individual capacities. Such an opinion would be similar to sanctioning of the conduct occurring during the Crusades and the Inquisition, just because it purports to be done for religious beliefs.

## FACTS

[¶ 33.] Plaintiffs sued Defendants, including Colony, for various torts. The trial court held a telephonic hearing and prematurely dismissed for lack of jurisdiction on the basis that the matter was "a purely religious dispute." We should reverse and remand.

[¶ 34.] Tschetter Hutterian Brethren, Inc. (Colony) is a nonprofit, religious corporation whose purpose is to "maintain living quarters and engage in a farming and agricultural operation" for the members of the Hutterian Church. The members live a communal life. The Board of Directors consists of three to seven members. Members are "[a]ll persons who reside upon the real property operated by [the] corporation and who are dependent upon the community fund and treasury for their support[.]" All married male members are voting members; all others are nonvoting members.

[¶ 35.] A conflict arose between members of the Colony following the removal in December 1992 of Jacob Kleinsasser as Senior Elder of the Hutterian Church. The Defendants accepted the new Senior Elder. The Plaintiffs rejected the new leadership and continued to follow Kleinsasser.

[¶ 36.] The conflict eventually resulted in the expulsion of the Plaintiffs from membership in the Colony in March 1995. Defendants claim that Plaintiffs stopped performing their jobs and "refused to follow the Hutterian Brethren Church or the rules and regulations of Tschetter Colony[.]" Plaintiffs were asked to either reconcile with the Colony or leave the premises. Plaintiffs continued to reside on the Colony. Plaintiffs were not allowed to eat in the communal dining hall and were not allowed to use the Colony's vehicles. Plaintiffs purchased their own vehicle which they claim Defendants vandalized by breaking windows and slashing tires. Meters were placed on their homes in an attempt to make them pay for their own

11. Apparently, this decision was made and announced during a telephone conference to determine the status of a temporary restraining order granted to plaintiffs. There had been no discovery, no depositions, no interrogatories, no written motions, and no hearings. And yet, without warning, the trial court granted an oral telephone motion to dismiss with prejudice and the majority affirms it, making this case eligible for the "dead wrong award" for both procedure and substance, also known as the "double-dead wrong award."

utilities. When they refused to pay for their electricity, Defendants threatened to disconnect their electricity, water, and sewer. At one point, the electricity was disconnected at two homes.[12] Plaintiffs claim Defendants cut their clotheslines and broke windows on their homes. They also claim their children were mocked and ostracized by Defendants and their children.[13]

[¶ 37.] On April 17, 1998, Plaintiffs filed a complaint against the corporation and its directors, officers, and shareholders in their official capacities *and as individuals.* The complaint alleged: 1) tortious interference with a possessory interest and/or trespass to chattel; 2) trespass; 3) intentional infliction of emotional distress; 4) negligent infliction of emotional distress; 5) joint venture; 6) oppression of corporate minority members; 7) breach of fiduciary duty; 8) implied trust; and 9) unjust enrichment. In the complaint, Plaintiffs claim Defendants "maliciously damag[ed] Plaintiffs' vehicles, personal property, and house." They claim Defendants prevented them from performing their jobs and locked them out of the Colony kitchen, laundry facilities, and shops. They claim Defendants "maliciously assault[ed] Plaintiffs by recklessly and intentionally driving vehicles at the Plaintiffs and by driving vehicles within dangerous proximity of the Plaintiffs while the Plaintiffs were walking,

all of which placed them in fear of imminent bodily harm and caused them great emotional distress."

[¶ 38.] Plaintiffs obtained an ex parte temporary restraining order on May 5, 1998. A hearing was scheduled for May 12. The attorney for Defendants contacted the trial judge and filed a motion to set aside the temporary restraining order. It did not include a written motion to dismiss. A telephonic hearing was held May 8. Plaintiffs claim they were not given notice regarding the nature of the hearing and were not given a real opportunity to respond.[14]

[¶ 39.] As indicated, at the conclusion of the hearing, the trial court dismissed the temporary restraining order *and* the complaint "with prejudice." It concluded that the cause of action was "a purely religious dispute" and, therefore, it lacked jurisdiction.

## [¶ 40.] THE TRIAL COURT ERRED IN DISMISSING THE COMPLAINT FOR LACK OF JURISDICTION.

[¶ 41.] The trial court found that Plaintiffs' complaint involved a religious dispute and dismissed the complaint *with prejudice* for lack of jurisdiction. Plaintiffs claim that the case "involves matters separate and distinct from questions of religion." They request "the opportunity that

---

12. Electricity was only disconnected at homes without minor children.

13. Defendant claims that Plaintiff's children were allowed to attend school and were furnished food during this period.

14. Plaintiffs filed objections following the hearing. They objected to:
    1. The Order dismissing the entire action with prejudice as none of the causes of action were based upon a religious issue.
    2. The lack of timely notice as to the telephone hearing.
    3. The scope of the hearing and the lack of notice as to a potential dismissal for want of jurisdiction as opposed to what the Court advised was to be a hearing to define the parameters of the Restraining Order.

4. The lack of opportunity to present written briefs on the issue of jurisdiction, oral argument on the issue of jurisdiction, and evidence in the form of testimony as to both the Restraining Order and jurisdiction.
5. The Court's claim that the Plaintiffs lack standing to sue.
6. The Dismissal of the Restraining Order in that the ex parte Restraining Order was appropriate based upon the fact that there existed a threat of irreparable harm to the movants, there was no significant detriment to the defendants pending the Tuesday hearing, there was a probability that the Plaintiffs['] request for the Restraining Order would be granted, and the public interest is in limiting or avoiding conflict.

all other individuals injured within this jurisdiction [South Dakota] have, that being the right to access the courts to resolve civil claims."

[¶ 42.] The California Court of Appeals in *Snyder v. Evangelical Orthodox Church*, 216 Cal.App.3d 297, 264 Cal.Rptr. 640, 644 (1989) addressed a dismissal for lack of subject matter jurisdiction on the ground that the causes of action were religious in nature. It stated: "While the 'free exercise clause' protects religious beliefs absolutely, however, it protects religious actions only qualifiedly." *Id.* (citing *Sherbert v. Verner*, 374 U.S. 398, 402–03, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963); *Molko v. Holy Spirit Ass'n*, 46 Cal.3d 1092, 252 Cal.Rptr. 122, 762 P.2d 46 (1988)). In evaluating the dismissal for lack of jurisdiction, that court assumed the allegation made in the complaint to be true, *Snyder*, 264 Cal.Rptr. at 645 (citations omitted), and stated: "[r]eligious disputes can take a number of forms, however, and do not always result in immunity from liability." *Id.* at 644.

[¶ 43.] "[I]ndividuals have a qualified privilege to engage in conduct for religious purposes. Conduct does not qualify for immunity based upon the privilege if the conduct at issue is not religiously motivated." *Korean Presbyterian Church v. Lee*, 75 Wash.App. 833, 880 P.2d 565, 568 (1994) (citations omitted). "Where a plaintiff can establish that the defendant acted with actual malice, such malice negates any claim that the action was undertaken for religious purposes." *Id.* at 569. The Plaintiffs in this case make allegations of tortious conduct including damage to personal property and verbal and physical threats.[15] The causes of action include intentional and negligent infliction of emotional distress. "These allegations . . .— whatever the actual proof—describe secular conduct, the pretext of religious purpose notwithstanding, and hence state a cause of action outside the scope of the free exercise clause." *Hester v. Barnett*, 723 S.W.2d 544, 564 (Mo.Ct.App.1987).

[¶ 44.] The Defendants cannot commit torts under the cloak of religion, thereby receiving immunity from liability, until it is clearly shown that determination of the claims would require impermissible entanglement with religion. *See Snyder*, 264 Cal.Rptr. at 648 (stating "[w]e therefore hold that on a motion to dismiss for lack of jurisdiction, it is insufficient for respondents to no more than generally allege, as a substantive defense to tort liability, that their conduct was religious in nature."). The trial court acted prematurely in concluding it lacked jurisdiction. Obviously, genuine material issues of fact arise in many respects, including: whether the alleged torts were committed and whether

15. Plaintiffs complaint states, in part:

11. That within the past three years and through the present time the Defendants have jointly and severally, intentionally and negligently, wantonly and willfully engaged in a course of conduct which includes (but is not limited to) maliciously damaging Plaintiffs' vehicles, personal property, and houses. The Defendants have cut down Plaintiffs' clotheslines. They have locked the Plaintiffs out of their place of worship. They have locked them out of the shops, kitchen, and laundry facilities of the colony; and have excluded the Plaintiffs from working at any of their jobs at the colony. The Defendants have threatened and actually disconnected some of Plaintiffs' utilities during the winter months.

12. That within the past three years and through the present time the Defendants

have jointly and severally, intentionally and negligently, wantonly and willfully engaged in a course of conduct which includes maliciously assaulting Plaintiffs by recklessly and intentionally driving vehicles at the Plaintiffs and by driving vehicles within dangerous proximity of the Plaintiffs while the Plaintiffs were walking, all of which placed them in fear of imminent bodily harm and caused them great emotional distress.

. . . .

14. The Defendants have also negligently and intentionally threatened Plaintiffs verbally and physically throughout the past three years. The Defendants have expressed through words and actions their intent to cause Plaintiffs' emotional distress and personal injury.

qualified immunity would exist to protect same.

[¶ 45.] We should not address the actual merits or eventual success of Plaintiffs' claims. Plaintiffs have pled sufficient facts in their complaint to entitle them to proceed to attempt to prove their claims. *See Bear v. Reformed Mennonite Church*, 462 Pa. 330, 341 A.2d 105, 108 (1975) (stating: "While the First Amendment may present a complete and valid defense to the allegations of the complaint, in the instant case, appellant has pleaded sufficient facts and created sufficient 'doubt' that would entitle him to proceed with his action in order that he may attempt to prove the requisite elements that would entitle him to relief[.]"). Therefore, we should reverse and remand for proceedings consistent with this dissent.

[¶ 46.] AMUNDSON, Justice, joins this dissent.