# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1153MN

_____

Novartis Seeds, Inc.                                  *
                                                      *
        Appellant,                                   *
                                                      *
                                                      *   On Appeal from the United
    v.                                           *   States District Court
                                                      *   for the District of
                                                      *   Minnesota.
Monsanto Company,                                     *
                                                      *
        Appellee.                                    *

_____

Submitted:  May 14, 1999

Filed: September 7, 1999

_____

Before RICHARD S. ARNOLD, JOHN R. GIBSON, and BOWMAN, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.


This lawsuit began in 1997 when Novartis Seeds, Inc., sued Monsanto Company in a Minnesota state court.  The plaintiff alleged that Monsanto broke development and license agreements involving genetically engineered, insect-resistant seed corn.  After removing the case to the District Court, Monsanto filed a motion to dismiss for want of jurisdiction over the subject matter (a Rule 12(b)(1) motion), claiming that Novartis Seeds lacked "standing" because assignment and transfer restrictions in the 1995 License Agreement were violated when the plaintiff's parent company merged with

another corporation. This breach, Monsanto argued, terminated the contract, and deprived Novartis of its standing to sue. The District Court agreed, holding that it did not have subject-matter jurisdiction. We reverse. In our view, whether an assignment or transfer in violation of the License Agreement took place has nothing to do with subject-matter jurisdiction, but rather with an arguable defense on the merits. We remand for further proceedings.

I.

The transactions at the center of this dispute are complex, and we will attempt to explain them simply. The plaintiff, Novartis Seeds, a company in the business of developing and selling seeds to farmers, was formerly known (before a name change) as Northrup King Company. Northrup King was a wholly owned subsidiary of the Sandoz Corporation, which, along with Sandoz Seeds Ltd., was a wholly owned subsidiary of Sandoz AG, a Swiss corporation.

Monsanto and Sandoz Crop Protection Corporation, another Sandoz company, signed an agreement in 1988 that allowed Sandoz Crop and its affiliates, of which Northrup King was one, to use a certain kind of gene that had been developed by Monsanto. Use of this gene allowed Northrup King to develop commercially viable corn that is resistant to the European corn borer, a pest that causes millions of dollars in damage each year in the United States. The Development Agreement was extended several times, and, in 1995, was replaced by a License Agreement. The named parties to the License Agreement were Monsanto and Sandoz Seeds Ltd. Also parties to the Agreement were Sandoz Seeds' "affiliates," a group that included Northrup King.

In late 1996, Sandoz AG merged with another Swiss corporation, Ciba-Geigy AG. Under Swiss law, a merger results in a new entity, and it was named Novartis AG. Following the merger, Sandoz Seeds Ltd. was renamed Novartis Seeds AG. In addition, Sandoz Corporation, which owned all of Northrup King's stock, was merged

into Ciba-Geigy Corporation under New York law, and Ciba-Geigy Corporation changed its name to Novartis Corporation. Novartis Corporation, the newly named parent of Northrup King, later transferred its shares in Northrup King to Novartis Finance Corporation, a wholly owned subsidiary of Novartis Corporation. Shortly thereafter, Northrup King was renamed Novartis Seeds, Inc.

The 1995 License Agreement between Monsanto and Sandoz Seeds Ltd. restricted the ability of Sandoz Seeds Ltd. to transfer or assign license rights to Monsanto's technology. Section 10.06(a) provided that "the rights acquired herein . . . are not assignable or transferable in whole or in part (by operation of law or otherwise) to any third party without the prior written consent of Monsanto; provided, however, that Sandoz may assign or transfer this Agreement in whole or part as part of the sale or transfer of substantially all of a business to which this Agreement pertains to a successor or assign; provided that, advance notice is given to Monsanto and the successor/assignee shall enter into a written agreement with Monsanto to be bound by the terms, conditions and obligations of this Agreement."

Section 10.06(a), however, was made subject to Section 10.06(b), which provided that "[a]ssignment or transfer under Subsection 10.06(a) to a third party owner or licensee of any issued or pending . . . patent right . . . which patent right relates to modification of insect control protein(s) from Bacillus thuringiensis (B.t.) or generally to the expression of one or more insect control proteins of B.t. in plants, including but not limited to corn, which patent right may dominate the production, use or sale of Licensed Corn Products by Monsanto . . . shall be void and of no effect . . .." Section 10.06(d) further provided that "[a]ny transfer, assignment or delegation made or attempted in violation of this Section 10.06 shall be void and of no effect."[1]

---

[1] We are not sure we understand what is meant by saying, as Section 10.06(b) does, that one patent right "may dominate" the production, use, or sale of certain products. The parties have not explained this term to us. But the point is not important

-3-

II.

As we have said, Novartis Seeds filed its lawsuit against Monsanto in a Minnesota state court, alleging (among other things) that Monsanto broke the License Agreement. Monsanto removed the case to the District Court and filed an answer and counterclaim, alleging that Novartis Seeds had itself broken the License Agreement. Monsanto then moved to dismiss the complaint, pursuant to Fed. R. Civ. P. 12(b)(1), on the grounds that Novartis Seeds lacked standing to prosecute its claims. Monsanto's theory, as we have described above, was that the merger between Sandoz and Ciba-Geigy terminated Novartis Seeds' rights under the License Agreement. Monsanto argued that Novartis Seeds was a third party to the Agreement and possessed no rights itself under the Agreement, either as a party or as a third-party beneficiary. Therefore, Monsanto asserted, the District Court did not have subject-matter jurisdiction to decide the claims. Following some discovery and a hearing, the District Court granted Monsanto's motion to dismiss.

The District Court began by analyzing the corporate reorganization which had taken place. In the Court's view, as a result of the merger of Sandoz AG and Ciba-Geigy AG, "the assets and liabilities of Northrup King, a former wholly-owned subsidiary of Sandoz Corporation, became the assets and liabilities of Ciba-Geigy. Ciba-Geigy then created Novartis Seeds, Inc. . . .." Novartis Seeds, Inc. v. Monsanto Co., Civil No. 97-2925 (D. Minn. Dec. 4, 1998), slip op. 2. "Accordingly, all assets owned or held by Sandoz Seeds, Sandoz Corporation, and Northrup King became a part of Ciba-Geigy, the surviving company." Id. at 6. "Because of the merger, Sandoz Seeds and Northrup King no longer exist. . . . The [License] Agreement and all other assets of Sandoz Corporation and Northrup King became Ciba-Geigy's. Ciba-Geigy

_____

for present purposes. Whatever "may dominate" means, whether an assignment or transfer in violation of the License Agreement occurred relates to a defense on the merits, not the existence vel non of subject-matter jurisdiction.

-4-

then changed its name to Novartis Corporation and branched into additional corporate identities such as Novartis Seeds, Inc., and Novartis Financial. The assets from Ciba-Geigy flowed from it to these new subsidiaries. Therefore, at the time of the merger, Novartis [Seeds, the plaintiff] did not even exist." Id. at 7.

In these circumstances, the Court thought, a violation of Section 10.06 had occurred. Whatever rights Northrup King had had under the License Agreement had been transferred to a new entity, which new entity, Ciba-Geigy, "was the owner of a pending U.S. patent right which patent right related to the expression of one or more insect control proteins of B.t. in plants." Id. at 9. "[T]he transfer of assets from Sandoz to Ciba-Geigy violated the anti-transfer provision of the 1995 agreement. Therefore, Novartis Seeds, Inc. has no standing to litigate this suit against Monsanto. Thus, this Court lacks subject-matter jurisdiction." Id. at 10.

III.

Under Article III, section 2 of the Constitution, our courts are limited to deciding actual "cases" or "controversies." That a plaintiff must have standing in order to pursue a lawsuit is firmly rooted in our constitutional history, and requires that a plaintiff allege a judicially cognizable and redressable injury. As the Supreme Court has said, "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). To have standing, a plaintiff must allege an injury that is fairly traceable to the defendant's conduct, and the requested relief must be likely to redress the alleged injury.

We have no doubt that the plaintiff here has "standing" in the constitutional, Article III sense. Novartis Seeds alleges that Monsanto's conduct has violated the License Agreement (as well as transgressed against plaintiff's legal rights in other respects). The requested relief would redress this alleged injury. Monsanto's answer,

by way of defense, is that the other side has violated the agreement in an important respect, by making a transfer or assignment, or an attempted transfer or assignment, that violates Article 10.06. Because of this breach, Monsanto argues, the plaintiff has no legal right to complain of any alleged breach on the part of Monsanto. As a matter of the English language, the word "standing" can be used to describe this sort of contention, but "standing" in this context is entirely distinct from "standing" for purposes of Article III.

Monsanto's contention, if upheld, establishes no more than a defense on the merits, and the distinction between such a defense and subject-matter jurisdiction is a vital one. See, e.g., Bell v. Hood, 327 U.S. 678, 682 (1946), where the Supreme Court said:

> Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction.

To the same effect are Steel Co. v. Citizens for a Better Environment, 118 S. Ct. 1003, 1010 (1998); Campbell v. Minneapolis Public Housing Authority, 168 F.3d 1069, 1074

(8th Cir. 1999) ("We repeat the fundamental principle that the ultimate merits of the case have no bearing on the threshold question of standing.").

If plaintiff's allegations of misconduct on the part of Monsanto have merit, and that is the hypothesis upon which we must proceed at this stage of the case, plaintiff clearly has standing in the constitutional sense. So we cannot agree with Monsanto on this point. Monsanto urges us, nevertheless, to affirm the judgment on the ground that the facts in the case are undisputed, an assignment in violation of the contract did take place, and that, therefore, whether the question is properly labeled as one of "standing" or not, judgment is appropriate in Monsanto's favor as a matter of law. We decline to go that far at the appellate level for a number of reasons. The matter was presented to the District Court as a question of subject-matter jurisdiction under Rule 12(b)(1). No motion to dismiss under Rule 12(b)(6) for failure to state a cause of action was ever ruled on, and no motion for summary judgment under Fed. R. Civ. P. 56 was ever filed. At the time of the District Court's ruling on the 12(b)(1) motion, discovery on the merits had apparently been stayed, at the request of Monsanto, for just over seven months. Accordingly, we are not confident that the District Court had before it, or that we have before us, all of the evidence that either side would consider relevant if the issue of the lawfulness of the assignment or transfer were presented in its proper context, that is, as a defense on the merits on which Monsanto, or perhaps both sides, would claim entitlement to judgment as a matter of law.

In addition, although Monsanto asserts that all of the relevant facts are undisputed, we are not sure that this is so. Monsanto's defense goes beyond the assertion that the corporate reorganization resulted in an assignment or transfer contrary to the express words of Section 10.06. Monsanto also claims that, even if the express words of the contract were not violated, the corporate reorganization undertaken by the Sandoz companies was a violation of the covenant of good faith and fair dealing that, it is said, inheres in every contract. Such a contention, we think, may go beyond the bare historical facts, and may require inferences from those facts. We are not prepared

-7-

to say, on the basis of the present record, that all of those inferences would necessarily go one way. We are not holding that Monsanto is not entitled to judgment as a matter of law on such a theory. We are holding only that this question should be explored by the District Court on remand. We do not feel sufficiently confident to address it ourselves.

So the case must go back for further proceedings on the merits. We add the following additional comments that may be helpful to the parties and the District Court.

1.     The assets and liabilities of Northrup King did not, as a result of the corporate reorganization or otherwise, become the assets of Ciba-Geigy or of Novartis AG. The corporate existence of Northrup King was not affected. It continued to exist, and it retains title to its own assets and liabilities.

2.     Novartis Seeds, Inc., is not a newly created corporation. It is the same corporation as Northrup King. What occurred was simply a name change. Novartis Seeds, Inc., like Northrup King, retains its separate corporate existence. It is not correct to say that at the time of the merger Novartis Seeds did not exist. It did exist, though under its former name, Northrup King.

3.     The complaint alleges claims under the License Agreement, but it also alleges a number of other claims, including claims for breach of the 1988 Development Agreement and claims for breach of fiduciary duty. Even if a transfer occurred that violated the License Agreement, and even if, as a consequence, plaintiff is not entitled to recover for any breach of that agreement, the other claims alleged by plaintiff may survive. They should be separately analyzed. If, for example, some of these other claims accrued before the allegedly unlawful transfer, we do not see how this transfer, even if violative of the License Agreement, could bar them.

4.      Finally, about two and one-half months after plaintiff filed this action, Monsanto filed suit in the United States District Court for the Eastern District of Missouri against Novartis Seeds AG.  Plaintiff claims that the allegations in this suit are identical to those in Monsanto's counterclaim in the present case.  Plaintiff made a motion to enjoin Monsanto from prosecuting the Missouri lawsuit.  After informal consultation with the judge to whom the Missouri lawsuit was assigned, the District Court concluded that no action on this motion was required, because the Missouri court had decided to stay the action before it.  Then, when the District Court dismissed this case for lack of subject-matter jurisdiction, it denied the motion to enjoin the Missouri suit as moot.  Plaintiff asks us to instruct the District Court to hear and decide its motion to enjoin.

Plaintiff should address this request to the District Court on remand.  The same practical reasons that led the Court not to issue an injunction, at least de facto, may still exist.  We have no way of knowing.  This is a discretionary matter best addressed by the District Court on remand after informing itself as to all of the relevant circumstances concerning the present status of both cases.

IV.

For the reasons given, we reverse the judgment of the District Court, which dismissed this case for lack of subject-matter jurisdiction.  We hold that the District Court does have subject-matter jurisdiction.  The case is remanded to that Court for further proceedings on the merits consistent with this opinion.

It is so ordered.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.