# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-3160

_____

Hutterville Hutterian Brethren, Inc., a South Dakota nonprofit corporation; George
Waldner, Sr.; Tom Waldner; Kenneth Waldner, individually and as officers and
directors of Hutterville Hutterian Brethren, Inc.

*Plaintiffs - Appellants*

v.

Jeffrey T. Sveen; Rodrick L. Tobin; Harvey C. Jewett; Siegel, Barnett & Schutz,
L.L.P., a South Dakota limited liability partnership

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of South Dakota - Aberdeen

_____

Submitted: September 23, 2014
Filed: January 13, 2015

_____

Before RILEY, Chief Judge, LOKEN and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

This case publishes a new chapter in the legal struggle for control of Hutterville
Hutterian Brethren, Inc. (Hutterville), a South Dakota religious nonprofit corporation
whose members have split into factions, mirroring a larger division in the Hutterite
religion. Though both factions claim the right to control Hutterville, the South

Dakota Supreme Court has ruled this issue is not constitutionally determinable by secular courts under either the federal constitution or the state constitution because the questions of corporate governance cannot be answered without delving into disputes of ecclesiastical[1] polity and hierarchy which "are shielded from judicial scrutiny under the First Amendment." Hutterville Hutterian Brethren, Inc. v. Waldner (Hutterville I), 791 N.W.2d 169, 179-80 (S.D. 2010) (no jurisdiction to answer governance issues); see also Wipf v. Hutterville Hutterian Brethren, Inc. (Hutterville II), 808 N.W.2d 678, 686 (S.D. 2012) (no jurisdiction to mandate corporate dissolution). With the South Dakota Supreme Court effectively leaving a legal stalemate, the leaders of one faction brought the present suit against several attorneys and a law firm who allegedly conspired with leaders of the other faction to "manufacture" the apparent religious schism and improperly place the conspiring faction leaders in command of Hutterville. The district court[2] dismissed the case, reasoning it could not determine the presence of standing under Article III of the United States Constitution without reaching the same religious impasse that halted the South Dakota state courts. Equipped with appellate jurisdiction, see 28 U.S.C. § 1291, we affirm.

I.     **BACKGROUND**
   **A.     History**

As the South Dakota Supreme Court explained, the Hutterite religion descends—like the Amish and Mennonite religions—from the Anabaptist movement

---

[1]Strictly defined, "ecclesiastical" relates specifically to Christianity, see New Oxford American Dictionary 549 (3d ed. 2010) (defining the term as "of or relating to the Christian Church or its clergy"), but we use the term in a more colloquial sense to mean "of or relating to the formal and established institutions or government of any religion," Merriam Webster's Third New International Dictionary 718 (1993).

[2]The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota.

in sixteenth-century Germany and takes its name from its founder, Jacob Hutter, who was burned at the stake in Innsbruck in 1536. See Hutterville II, 808 N.W.2d at 680; Decker ex rel. Decker v. Tschetter Hutterian Brethren, Inc., 594 N.W.2d 357, 359 (S.D. 1999). In the 1870s and 80s, the Hutterites fled religious persecution in Europe, relocating in Canada and the northern United States, where their colonies remain today. See Decker, 594 N.W.2d at 359. One of the more distinguishing characteristics of the Hutterite faith is what the South Dakota Supreme Court referred to as a "community of goods"—Hutterites must disavow individual property ownership in favor of a communal lifestyle within each colony. See Hutterville II, 808 N.W.2d at 680.

As the Waldners explain, the Hutterian Brethren Church (Hutterian Church) is organized into three conferences—the Dariusleut, Lehrerleut, and Schmiedeleut Conferences—with each Hutterite colony belonging to one of these conferences. Hutterville Colony (the congregation associated with Hutterville, the corporation) is a South Dakota colony historically belonging to the Schmiedeleut Conference. See id. Consistent with the community-of-goods principle, members of Hutterville Colony live a communal lifestyle with all of the colony's real and personal property belonging to Hutterville. See id. Hutterville itself is a South Dakota nonprofit corporation, managed by an elected board and elected officers, who operate Hutterville as a communal farm for the colony. Formed with the stated purpose of promoting the Hutterite faith and Hutterian Church, Hutterville conducts the colony's business and owns all property in lieu of individual property ownership.

In 1983, when Hutterville and Hutterville Colony first formed, Reverend Jacob Kleinsasser was the Senior Elder (i.e., the spiritual and ecclesiastical leader) of the Schmiedeleut Conference. See Decker, 594 N.W.2d at 360. According to the complaint, this position made Rev. Kleinsasser "the final arbiter or decision-maker regarding issues affecting the members of the Church."

Around 1992, a large group of Hutterite ministers repudiated Rev. Kleinsasser's leadership in response to accusations of impropriety, and these ministers opted instead to follow Reverend Joseph Wipf. See id. The remaining ministers supported Rev. Kleinsasser. See id. Colonies following Rev. Wipf (forming the Schmiedeleut "Group 2") solidified their division in 1993 by ratifying a new constitution which purported to institute new conference leadership. See Hutterville II, 808 N.W.2d at 680. Rev. Kleinsasser's colonies (forming the Schmiedeleut "Group 1") refused to adopt the 1993 constitution, preserving their position in favor of Rev. Kleinsasser. See id. As the South Dakota Supreme Court explained, "[e]ach Group maintained that it was the *true* Schmiedeleut." Id. (emphasis added) (quotations omitted).

Meanwhile, according to the complaint, Reverend George Waldner, Sr.—Hutterville Colony's minister and ecclesiastical leader, as well as Hutterville's president and one of its directors—remained loyal to Rev. Kleinsasser and insisted that Hutterville Colony belong to Group 1 of the Schmiedeleut Conference. Not everyone in the Hutterville Colony agreed, and the members of Hutterville split into Group 1 (Waldner faction) and Group 2 (Wipf faction) supporters. See id.

Fifteen years later, the tensions of this internal split boiled over. The complaint alleges that through a series of "sham" corporate meetings in late 2008 and early 2009, a number of Wipf faction members were improperly elected to replace Waldner faction officers and directors. Among these was Johnny Wipf, who claimed to have been elected president to replace Rev. Waldner. Rev. Waldner and his faction challenged the validity of these elections and claimed Waldner faction members still maintained control. At loggerheads over who controlled the corporation, each faction began having its own member and board meetings and conducted business in the name of the company, all the while condemning the other faction's purported officers and directors as fraudulent imitators.

-4-

## B. Hutterville's State Court Litigation

In August of 2009, Johnny Wipf and other Wipf faction members brought suit in South Dakota state court against Rev. Waldner, Tom Waldner, and Kenneth Waldner (Waldners), "seeking a declaration that [the Wipf faction members] were the properly elected directors of Hutterville." Hutterville I, 791 N.W.2d at 172. Using Hutterville's bylaws and articles of incorporation, the state trial court determined the Wipf faction members were its duly elected directors and officers. See id. After the unfavorable decision, Rev. Waldner, who remained minister of the Hutterville church, and Rev. Kleinsasser signed a "Resolution of Action Taken by Hutterian Church Group I," which states:

> The undersigned, being duly authorized by Hutterian Church Group I to act on its behalf, hereby declare that Johnny Wipf, Alvin Hofer and Jake Hofer Sr., residents of Hutterville Hutterian Colony, are hereby excommunicated/removed as Members of the Hutterian Church, effective as of August 19, 2009. As a result of such excommunication, the said Johnny Wipf, Alvin Hofer and Jake Hofer Sr. shall no longer be considered Members of Hutterian Church Group I, nor shall they be entitled to attend services or participate in Church activities.

See id. at 172. According to the Waldner faction, excommunication from the local church made these Wipf faction members ineligible for corporate membership in Hutterville and unable to hold a director or officer position. See id. at 173.

Challenging the validity of the excommunication, the Wipf faction asked the state trial court to declare that the excommunication did not affect its conclusion that the Wipf faction members were the duly elected directors and officers of Hutterville. See id. at 172-73. Before a hearing could be held on the issue, the Waldners "moved to dismiss [the Wipf faction's] complaint for lack of subject matter jurisdiction." Id. at 173. The state trial court agreed jurisdiction was lacking and dismissed the Wipf faction's lawsuit because the matter required the court to decide disputed religious

questions. See id. at 174. Accepting the Waldners' argument, the South Dakota Supreme Court affirmed, reasoning the federal constitution and the South Dakota constitution prohibit state courts from resolving disputes of religious doctrine and ecclesiastical polity, despite the presence of a secular claim. See id. at 179-80. The court rejected the argument that control of the Hutterville corporation could be determined by a neutral reading of its articles of incorporation and bylaws because fundamental questions—such as status as a corporate member, director, or officer—were "inseparable" from disputed religious questions of church membership and leadership. Id. at 179.

In a second state action, the Wipf faction alleged deadlock and misapplication of corporate assets were causing irreparable harm to Hutterville's business and requested the dissolution of Hutterville and appointment of a receiver to wind up its business. See Hutterville II, 808 N.W.2d at 681. The trial court agreed and appointed a receiver, Harvey C. Jewett. See id.; see also Wipf v. Hutterville Hutterian Brethren, Inc. (Hutterville III), 834 N.W.2d 324, 328 (S.D. 2013). The South Dakota Supreme Court reversed, concluding "the underlying religious controversies over church leadership so pervade the dissolution of the religious corporation that the dissolution is beyond a secular court's jurisdiction." Hutterville II, 808 N.W.2d at 686.

Before this ruling, Jewett moved for approval of his accounting and for payment of his fees and expenses. See Hutterville III, 834 N.W.2d at 329. The trial court approved Jewett's actions and accounting. See id. In the ensuing months, the Waldners challenged aspects of the circuit court's approval of Jewett's accounting, but the trial judge stood by its initial ruling and, on October 25, 2012, terminated the receivership and discharged Jewett. See id. at 330-31. On appeal, the South Dakota Supreme Court affirmed the trial court, concluding the Waldners' allegations that

Jewett was an interested party[3] had been forfeited by a failure to object, reasoning any procedural errors in his appointment were harmless, concluding judicial immunity protected Jewett from liability, and rejecting on the merits the Waldners' claims of Jewett's bad faith. See id. at 334-36.

### C. This Lawsuit

In April 2012, as the factions were contesting the trial judge's ruling on Jewett's accounting, the Waldners filed the present action against Jewett, Siegel Barnett, and two Siegel Barnett attorneys named Rodrick L. Tobin and Jeffrey T. Sveen (collectively, attorneys), asserting claims under both the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and state law. The Waldners raise these claims in both their individual capacities and in Hutterville's name in their "official" capacities as purported corporate directors and officers.

The Waldners allege the attorneys, despite their fiduciary and ethical duties to Hutterville, worked with the Wipf faction to "manufacture" a dispute by which to "wrest control" of Hutterville, its business, and its assets "from its duly elected officers and directors" and in favor of the attorneys' Wipf faction collaborators. In particular, the Waldners allege Siegel Barnett attorneys met with Wipf faction leaders and explained that they would not be able to help the Wipf faction openly, but would "work behind the curtain" to help the Wipf faction take control of Hutterville. While representing Hutterville, the attorneys purportedly assisted the Wipf faction in making its sham elections appear legitimate by creating genuine-looking corporate minutes for numerous Wipf faction corporate meetings. The attorneys also allegedly instructed or advised the Wipf faction to take numerous actions depriving the Waldner faction of effective control of much of Hutterville's property. For example,

---

[3]The Waldners also claim "Jewett ha[d] been a member of" Siegel, Barnett & Schutz, LLP law firm (Siegel Barnett) "for approximately 30 years" and was "associated with" the firm at the time of his receivership appointment.

-7-

the Siegel Barnett attorneys allegedly "encouraged and assisted Wipf . . . to open a bank account at Great Western Bank [despite Hutterville's relationship with U.S. Bank], and to deposit into that account the proceeds of the sale of crops grown and livestock raised on Hutterville property." Additionally, the Waldners maintain Jewett held "himself out . . . as an 'independent' receiver, with loyalty only to the Court that appointed him," when in fact he was affiliated with Siegel Barnett and was "[a]cting in concert with Sveen, Tobin, and Siegel Barnett" to aid the Wipf faction's takeover and "to break down any resistence to [his] unlawful receivership."

The Waldners assert that by assisting the Wipf faction while purporting to represent Hutterville, the attorneys altered documents to impede official proceedings; helped transport stolen property known to have been taken unlawfully or through fraud; and committed numerous acts of wire, mail, bank, and common law fraud. The Waldners aver these actions constituted a pattern of predicate acts of racketeering activity and allege the attorneys violated all four subsections of 18 U.S.C. § 1962. The Waldners further allege that by assisting the Wipf faction, the attorneys breached their fiduciary duties to Hutterville and its duly elected agents (i.e., the Waldners), committed common law fraud, and violated S.D. Codified Laws § 20-10-1.

The attorneys jointly filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1) and (6). Granting the motion, the district court dismissed without prejudice all of the claims made in Hutterville's corporate name, reasoning that for the Waldners to have standing in their purported official capacities, it must be known which faction truly controls Hutterville. Citing the South Dakota Supreme Court decisions, the district court concluded this inquiry was impermissible because determining the "true" officers, directors, and members of Hutterville required the court to resolve religious and ecclesiastical disputes beyond the province of secular courts. The district court

also dismissed with prejudice the Waldners' individual claims against Jewett and the other defendants "for lack of any property right to make these types of property damages claims due to their individual renunciation of individual property." Specifically referring to the Waldners' individual capacity claims against Jewett, the district court also noted dismissal was warranted "as [Jewett] has been determined by the South Dakota Supreme Court to partake of judicial immunity as a receiver." The Waldners timely appealed.

## II.    DISCUSSION

Religious disputes can often stray outside the ecclesiastical arena into areas of secular concern. See, e.g., Jones v. Wolf, 443 U.S. 595, 602, 605 (1979) ("The only question presented by this case is which faction of the formerly united . . . congregation is entitled to possess and enjoy the [real] property [in question]."); Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 95 (1952) (deciding disputed right to use and occupy a church); Watson v. Jones, 80 U.S. (13 Wall.) 679, 681 (1871) (considering church property dispute between two intra-church groups). In these instances, secular courts can enter the fray when called upon to do so, but they may not resolve disputes of religious doctrine or ecclesiastical polity, because such a resolution would violate the First and Fourteenth Amendments to the United States Constitution. See Jones, 443 U.S. at 602, 605; accord Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich, 426 U.S. 696, 708-09 (1976). Such issues are reserved for "the highest ecclesiastical tribunal within a church of hierarchical polity" whose conclusions on these issues "shall not [be] disturb[ed]" by secular courts. Milivojevich, 426 U.S. at 709; accord Jones, 443 U.S. at 602. However, a court need not defer to an ecclesiastical tribunal on secular questions and permissibly may resolve a matter "by applying 'neutral principles of law.'" Church of God in Christ, Inc. v. Graham, 54 F.3d 522, 525-26 (8th Cir. 1995) (quoting Jones, 443 U.S. at 602).

Following these principles, the South Dakota Supreme Court has twice declared itself incapable of resolving Hutterville's corporate governance dispute because religious questions pervade the analyses. See Hutterville II, 808 N.W.2d at 686; Hutterville I, 791 N.W.2d at 179-80. This religious impasse proves decisive here too.

### A.    Standing for Claims in Hutterville's Name[4]

We must first address the presence of Article III standing for the Waldners' official capacity claims. See Brown v. Medtronic, Inc., 628 F.3d 451, 455 (8th Cir. 2010). To establish constitutional standing, the "person invoking the power of a federal court must" "prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." Hollingsworth v. Perry, 570 U.S. ___, ___, 133 S. Ct. 2652, 2661 (2013). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). Where, as here, the case has progressed only to "the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Id. (alteration in original) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990)).

The district court questioned whether Hutterville could show an injury-in-fact if the Waldners were not in control of the corporation. The district court explained that determining the existence of injury-in-fact "entails the fundamental question of

---

[4]Because the Waldners' official capacity claims effectively are claims by Hutterville itself, see Hafer v. Melo, 502 U.S. 21, 25 (1991), we address them as such and refer to all claims in Hutterville's name as the "official capacity claims."

whether the [Waldners] can bring claims on behalf of [Hutterville], the corporate entity that holds the property of the colony." The district court concluded the First Amendment would not permit the court to resolve this question. The attorneys similarly propose a First Amendment problem is inevitable because any injury to Hutterville "depends upon which faction has authority to speak and act for it" and "Johnny Wipf, the leader of the Wipf faction, has made clear that his faction has not authorized [this] litigation."

These are not questions of Article III standing. As the Waldners point out, the corporate control issue has "inextricably bound up" the jurisdictional question of injury with the merits of their claims, both of which are premised upon the attorneys acting in concert with Hutterville's false agents to obtain Hutterville property. The Waldners are correct that for purposes of standing, we cannot question who controls Hutterville or acts as its authorized agents. Such questions attack the Waldners' ability to prove their cause of action, yet "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." Warth v. Seldin, 422 U.S. 490, 500 (1975). "It is crucial . . . not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009).

It remains to be seen whether the Waldners can prove Sveen, Wipf, and the rest acted unlawfully, and "[i]f [the Waldners'] allegations of misconduct on the part of [the attorneys] have merit, *and that is the hypothesis upon which we must proceed at this stage of the case*, [the Waldners] clearly ha[ve] standing in the constitutional sense." Novartis Seeds, Inc. v. Monsanto Co., 190 F.3d 868, 871 (8th Cir. 1999) (emphasis added); see also Vietnam Veterans of Am. v. Shinseki, 599 F.3d 654, 658 (D.C. Cir. 2010) ("[T]he merits must be assumed when considering standing."); Braden, 588 F.3d at 592 ("We must assume . . . [plaintiff's] allegations are true."). The complaint details numerous injuries to the corporation—including the conversion

-11-

of its property and livestock, redirection of payments owed to Hutterville, and the unapproved re-titling of Hutterville-owned vehicles—inflicted by the purported conspiracy in favor of the allegedly expelled Wipf faction members. In one such instance, the complaint alleges Sveen, as part of the conspiracy, instructed Wipf to record a warranty deed Wipf "had fraudulently executed as Hutterville's 'president,'" which "purported to convey from Hutterville to himself as trustee and for no consideration, all the real property described therein." As alleged in the complaint, the injury is undoubtedly concrete and particularized; it is directly attributable to Sveen and Wipf's participation in the alleged conspiracy; and redress is readily available in the form of damages or equitable relief. Assuming the merits, the three prongs of Article III standing have been pled. See Perry, 570 U.S. at ___, 133 S. Ct. at 2661; Lujan, 504 U.S. at 560-61.

While wrong to dress the issue as one of Article III standing, the district court correctly recognized a crucial defect in the Waldners' claims.

## B.    Corporate Governance

We agree with the Waldners that the "only question" raised by the attorneys' arguments is "who may authorize the corporation to act." "[W]hether the person bringing the suit has authority to use the courts of that jurisdiction" is a "question of capacity to sue." Moore v. Matthew's Book Co., 597 F.2d 645, 647 (8th Cir. 1979) (per curiam). For corporations in federal court, capacity to sue depends on state law. See Fed. R. Civ. P. 17(b)(2). In Moore, we held that a single trustee lacked capacity to sue as the trustee of a corporation whose charter had been forfeited, because state law gave "the *trustees*" the power to sue in the corporate name. Moore, 597 F.2d at 647 (emphasis added) (quotations omitted). Because the trustee was "merely *a* trustee, not *the* trustee," the trustee "lacked capacity to sue" "[w]ithout joinder of the other trustees." Id. In a similar sense, whether the Waldners are directors and

-12-

officers of Hutterville naturally determines whether they *have* "official capacities" by which to sue in Hutterville's name.[5]

As a South Dakota nonprofit corporation, see S.D. Codified Laws § 47-23-28(3), Hutterville has the "power to sue and be sued, complain and defend, in its corporate name." Id. § 47-22-53. Given this form, it "can act only through individuals acting as [its] agents," which comes down to the board of directors—its "ultimate governing body." Nelson v. WEB Water Dev. Ass'n, Inc., 507 N.W.2d 691, 695 (S.D. 1993) (quotations omitted). Here, we confront the foreshadowed religious question: Which faction's members are Hutterville's rightful directors, that is, Hutterville's governing body?

The Waldners have shown corporate control is also a core premise of their causes of action, intertwined with the merits of both their official and individual capacity claims.[6] See supra section II.A. The Waldners concede their RICO claims

---

[5]Authorities suggesting "a third party may not object" "to an officer's lack of authority to initiate a lawsuit" "if [the] corporation does not object," 9 Carol A. Jones, Fletcher Cyclopedia of the Law of Corporations § 4216 (2008 rev. vol.); see, e.g., Farmers Union Oil Co. of New England v. Maixner, 376 N.W.2d 43, 46 (N.D. 1985); Vill. of Brown Deer v. City of Milwaukee, 114 N.W.2d 493, 497 (Wis. 1962), are not to the contrary, because it is undisputed the purported Wipf faction officers and directors condemn the Waldners' use of Hutterville's name in bringing the present lawsuit.

[6]We do not consider the Waldners' individual capacity claims to the extent they allege harm only to Hutterville's corporate assets and business, because the Waldners lack standing to assert such claims even if we assume they can prove they are Hutterville's duly elected officers and directors. See Alternate Fuels, Inc. v. Cabanas, 538 F.3d 969, 973 (8th Cir. 2008) ("[A] corporate officer cannot maintain a personal action against a third party for harm caused to the corporation, unless the officer alleges a direct injury not derivative of the company's injury.").

-13-

depend on the Waldners' rightful control, explaining that no predicate act of racketeering activity can be proven unless the Waldner faction—and not the Wipf faction—holds rightful control of Hutterville's director and officer positions. See Gallagher v. Magner, 619 F.3d 823, 841 (8th Cir. 2010) (requiring a "predicate act" of racketeering activity under 18 U.S.C. § 1961(1)); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 495 (1985). A review of the Waldners' complaint shows their individual capacity state law claims similarly depend on which faction has rightful control. As the Waldners make clear, the goal of this appeal is to obtain for Hutterville "the opportunity to conduct discovery and prove at an evidentiary hearing that there is no *bona fide* 'religious dispute,' *and that the [Waldners] are, in fact, Hutterville's officers and directors*." (Second emphasis added).

Thus, the question of who rightly controls Hutterville is the unavoidable nub of the Waldners' official and individual capacity claims, whether framed in terms of capacity to sue (for the official capacity claims) or the merits.[7]

## C.   First Amendment and Judicial Estoppel

Knowing that to resolve the disputes in this case this court must decide who controls Hutterville, we turn to whether the First Amendment will permit such an inquiry. The district court answered this question in the negative, reasoning the governance issue "is deeply intertwined with the religious dispute of who is properly

---

[7]The Waldners argue they, like the plaintiff in Drevlow v. Lutheran Church, Mo. Synod, 991 F.2d 468, 472 (8th Cir. 1993), should be given an evidentiary hearing or "an opportunity to prove [their] secular allegations at trial." Unlike Drevlow, the path to the Waldners' requested relief necessarily leads through the religious dispute. See id. at 471-72 ("At the present stage of this litigation we are unable to predict that the evidence offered at trial will definitely involve the district court in an impermissible inquiry" because "[t]he [defendant] Synod has not offered any religious explanation for its actions which might entangle the court in a religious controversy.").

a member of the true church and therefore also a member of the colony and a voting member of Hutterville." The Waldners counter that church membership is central to the governance question but that there is no live dispute because, in their view, "Hutterville has always been a . . . Group 1 Hutterite Church Colony, and the Group 1 Church hierarchy conclusively determined that Wipf is not a member and has no right to speak or act for Hutterville." They therefore claim, "Because civil courts are bound by and cannot question the Church's determination of its own membership, there is no 'religious dispute.'" The Waldners demand "the opportunity to prove . . . that any claimed 'religious dispute' is a sham and a fraud and that they are, in fact, Hutterville's officers and directors or were unlawfully removed."

The Waldners' current arguments contradict the position they took before the South Dakota Supreme Court. Rather than argue the state court *did* have jurisdiction and should decide the governance question in their favor (as they argue here), the Waldners in state court argued the question was untouchable and could not be resolved by a secular court in *either* faction's favor. In Hutterville I, the Waldners maintained a court could not determine "who controls Hutterville Hutterian Brethren, Inc." without determining "the identity of [Hutterville church's] decision making body" or members. Brief of Appellees, Hutterville I, 791 N.W.2d 169 (No. 25553), 2010 WL 5516994, at *12, 19-20. Both questions, the Waldners asserted, were "religious in nature and reserved to the church." Id. at *20. Because "the parties dispute[d] the validity of the church's excommunication of [the Wipf faction members] and who the true senior elders of the church [we]re," the Waldners reasoned that inquiry into the governance question entailed an unconstitutional intrusion by the court. Id. In Hutterville II, the Waldners similarly argued, "[T]he decision as to who are members of Hutterville Hutterian Brethren, Inc., cannot be decided without extensive inquiry into religious doctrine and beliefs of the Hutterian faith and South Dakota courts have no constitutional basis to interfere." Brief of Appellant, Hutterville II, 808 N.W.2d 678 (No. 25877), 2011 WL 7497040, at *20.

-15-

In both instances, the South Dakota Supreme Court agreed, ruling it could not determine church leadership or who was a member of Hutterville Colony's church. See Hutterville II, 808 N.W.2d at 686; Hutterville I, 791 N.W.2d at 179-80.

Having twice succeeded in foreclosing judicial determination and recognition of the proper directors and officers of Hutterville, the Waldners bring this federal action questioning the legitimacy of the Wipf faction's claim to Hutterville and asserting the legitimacy of their own offices. We will not permit the Waldners now to claim the religious questions are a "sham" or that these issues have been resolved all along. Nor will we permit the Waldners "the opportunity to prove . . . that they are, in fact, Hutterville's officers and directors or were unlawfully removed." "[T]he doctrine of judicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 679 (8th Cir. 2012) (quoting New Hampshire v. Maine, 532 U.S. 742, 749 (2001)). In applying the doctrine, we look to three non-exclusive factors:

> "First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

Id. (quoting New Hampshire, 532 U.S. at 750-51). The Waldners successively convinced the South Dakota Supreme Court that (1) the question of which faction has

-16-

authority to direct Hutterville required determinations of church membership, the validity of excommunications, and the proper designation of the "true" Schmiedeleut, and (2) inquiry into these questions were impermissible for secular courts. See Hutterville I, 791 N.W.2d at 175-80.

The Waldners do not contend these questions have been resolved since that time. When questioned at oral argument in this case, the Waldners could not identify any intervening ecclesiastical decisions which might have settled the questions. Nor do they identify newly discovered evidence resolving the governance issues in a way that permits the court to circumvent religious inquiries. At most, the Waldners argue the attorneys "invented, orchestrated and engineered a sham and fraudulent 'religious dispute' to conceal their scheme and to shield themselves from scrutiny and liability." The Waldners fail to explain what it means to have a "fraudulent" religious dispute, and even if correct that the attorneys orchestrated the dispute between Hutterville's factions, this does not negate the religious questions they previously highlighted—i.e., which excommunications were valid and which is the true church. These issues, the Waldners once argued, are both unavoidable and unanswerable, and we fail to see how the origin of the dispute makes these inquiries now any less necessary or any less controlled by religious matters.

## III.  CONCLUSION

We affirm the judgment and rulings of the district court, dismissing the official capacity claims without prejudice and the individual capacity claims with prejudice.

---

-17-